UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                :
CHANTAL SUTTON,                                 :
                                                :
                              Plaintiff,        :        16 Civ. 1778 (KPF)
                                                :
               v.                               :        OPINION AND ORDER
                                                :
CITIMORTGAGE, INC.,                             :
                                                :
                              Defendant.        :
                                                :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Like many Americans in the recent past, Plaintiff Chantal Sutton found

herself unable to make her mortgage payments in 2012 and applied for a

mortgage loan modification.  In October 2013, she received a permanent

modification, which lessened her monthly payments but left her with a balloon

payment due at the mortgage's termination in March 2019.  Dissatisfied with

the modification, Plaintiff sent various written requests to her mortgage

servicer, Defendant CitiMortgage, Inc.; dissatisfied with the responses to those

requests, Plaintiff brought this action in March 2016, alleging violations of the

Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, and

its implementing regulations, known as Regulation X, 12 C.F.R. §§ 1024.1-

1024.41, as well as Section 349 of New York's General Business Law.

Defendant has moved to dismiss Plaintiff's First Amended Complaint (the

"FAC") in its entirety.  For the reasons set forth in the remainder of this

Opinion, Plaintiff has failed to allege a viable claim under RESPA.  Accordingly,

the Court grants Defendant's motion to dismiss with respect to Plaintiff's RESPA claim, and declines to exercise jurisdiction over the pendent state-law claim.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The October 2013 Loan Modification

A substantial portion of Plaintiff's pleading concerns events that predate Defendant's putative RESPA violations; the significance of these earlier events is a point of contention between the parties. Plaintiff explains that she and her husband took out a 30-year mortgage to purchase their home in 2001, and refinanced that mortgage to reduce its length to 15 years in 2004. (FAC ¶¶ 19-21). The latter mortgage was, in turn, securitized by the mortgage lender. (*Id.* at ¶ 21). Plaintiff's communications regarding the mortgage have been with the

---

[1]     In resolving the instant motion, the Court has considered Plaintiff's First Amended Complaint and the two exhibits thereto ("FAC," Dkt. #18-1)), and has taken all well-pleaded allegations as true, as it must at this stage of the litigation. *See, e.g., Peralta* v. *St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015). Exhibit A to the FAC, a letter sent on Plaintiff's behalf on August 1, 2014, has itself five exhibits; for clarity, the Court will use "Ex. [exhibit designation]" to refer to the exhibits to the FAC and "Ltr. Ex. [exhibit designation]" to refer to the exhibits to the August 1, 2014 letter. The transcript of the pre-motion conference held on June 1, 2016, is referred to as "June 1 Tr." (Dkt. #20).

The Court notes that several significant documents, including certain of Plaintiff's communications with Defendant that underlie her claims in this lawsuit, were not included as exhibits; for these, the Court relies on Plaintiff's description of the communication. *Cf. Kilgore* v. *Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 538 (E.D.N.Y. 2015) ("To plead a claim under the RESPA, plaintiff must offer proof either by attaching the letter or pleading with specificity such facts — such as when the letter was sent and to whom it was directed, why it was sent, and the contents of the letter — that the Court may determine if the letter qualifies as a [qualified written request] or notice of error.").

For convenience, Defendant's memorandum of law in support of its motion to dismiss is referred to as "Def. Br." (Dkt. #23), Plaintiff's memorandum of law in opposition as "Pl. Opp." (Dkt. #24), and Defendant's reply as "Def. Reply" (Dkt. #30).

mortgage servicer, rather than the mortgage lender; since at least 2012, the mortgage has been serviced by Defendant.  (*Id.* at ¶¶ 22, 25).

Mr. Sutton's business began to falter in 2010, and no later than June 2012, the Suttons were unable to make their monthly mortgage payments.  (FAC ¶¶ 26-27).[2]  In consequence, Plaintiff applied for, and received, a permanent loan modification in October 2013.  (*Id.* at ¶ 29; *see also id.* at ¶ 30 (noting that Defendant's correspondence recited that the modification was made pursuant to the Home Affordable Modification Program, or "HAMP")).[3]  As Plaintiff alleges, however, the application process was fraught because, contrary to her repeated requests, Defendant "amortized the modified loan over an extended term, but did not actually extend the term of the loan, creating a balloon payment due at the original maturity date."  (*Id.* at ¶ 42). Concerned about the prospect of foreclosure of her family home, Plaintiff signed

---

[2]     Plaintiff is careful not to allege that she ever defaulted on her mortgage, either before or after the loan modification.  (*See, e.g.*, FAC ¶ 7 (seeking modification "so that [Plaintiff] would not face the prospect of near certain default in five years")).

[3]     *See Griffith-Fenton* v. *Chase Home Fin.*, No. 11 Civ. 4877 (VB), 2012 WL 2866269, at *3 (S.D.N.Y. May 29, 2012) (internal citations omitted), *aff'd sub nom. Griffith-Fenton* v. *MERS*, 531 F. App'x 95 (2d Cir. 2013) (summary order):

> HAMP is a federal program established pursuant to the Emergency Economic Stabilization Act of 2008. HAMP was designed to help financially struggling homeowners by reducing their monthly loan payments to an affordable level, and provides financial incentives to loan servicers and investors to encourage them to modify the terms of existing private mortgages in order to avoid foreclosure. HAMP is administered by the Federal National Mortgage Association ("Fannie Mae"), which enters into Servicer Participation Agreements ("SPAs") with individual servicers to perform loan modifications.  Participation in the program is voluntary, and the servicer ultimately determines whether a borrower is eligible for a loan modification.

Plaintiff alleges that Defendant was a HAMP participant during the relevant time period. (FAC ¶ 32).

the permanent loan modification documentation on October 9, 2013.  (*Id.* at ¶¶ 57-58 & Ltr. Ex. B).

### 2.    Plaintiff's Post-Modification Requests and Defendant's Responses

Plaintiff observes that, at the time she entered into the permanent loan modification, there was no mechanism under HAMP or RESPA to appeal the terms of that modification.  (*See* FAC ¶¶ 50-51).  Having failed to obtain a term extension from Defendant before signing the modification paperwork — and experiencing a form of buyer's remorse over the balloon payment to which she had agreed — Plaintiff sought to obtain a term extension after the fact. Specifically, Plaintiff submitted at least three written letters seeking information concerning her account; the parties dispute whether these communications constitute "Qualified Written Requests" or other inquiries that would precipitate disclosure or correction obligations under RESPA.

### a.    The February 2014 Request

A mere six months after agreeing to the loan modification, in February 2014, Plaintiff submitted a letter to Defendant in which she (i) advised Defendant of her belief that her account was in error because Defendant had rejected her requests for a term extension and (ii) requested the identity of the owner of the mortgage.  (FAC ¶ 62).  Defendant responded on February 28, 2014, that the mortgage owner was SASCO (short for Structured Asset Securities Corporation), and that SASCO's guidelines prohibited Defendant from extending the term of Plaintiff's loan.  (*Id.* at ¶ 63 & Ltr. Ex. C (noting that "[p]er [SASCO's] guidelines we cannot extend the maturity date on your loan.

4

Any balloon amount or deferred amounts are due at the original maturity date. This private investor voluntarily participates in HAMP, but per their own guidelines.")).

### b.    The May 2014 Request

Plaintiff submitted a supplemental request for information in May 2014, seeking contact information for SASCO, as well as the specific language in the SASCO servicing agreement that governed the granting of extensions. (FAC ¶ 64). Defendant responded, at least in part, on May 29, 2014; it provided additional information, including contact information,[4] for the mortgage owner; distinguished and delimited *its* obligations as servicer of the mortgage; and advised that a copy of Plaintiff's payment history would be sent under separate cover. (*Id.* at ¶ 65 & Ltr. Ex. D).[5]

### c.    The August 2014 Request

Plaintiff's third request for information was sent by her counsel on August 1, 2014. (FAC ¶ 70 & Ex. A). Counsel began by asserting that the letter was a "qualified written request" under RESPA, and that Plaintiff's account was in error because Defendant had "failed to grant [a] term extension in connection with her HAMP modification and, instead, wrongly asserted that

---

[4]    The FAC alleges that Defendant "failed to provide the requested contact details," which would appear to be belied by the text of its May 29 response. (*Compare* FAC ¶ 65, *with* Ltr. Ex. D). In opposing the motion to dismiss, Plaintiff clarifies that the May 29 response was inadequate because it contained only "an abbreviation of the trust's name and contact information for the master servicer." (Pl. Opp. 2 n.1). The Court finds this clarification to border on the pedantic.

[5]    In the May 29 response, Defendant also referred Plaintiff to its correspondence of April 24, 2014, in response to "point number 3 of your letter." (Ltr. Ex. D). Neither Plaintiff's letter nor Defendant's response of April 24 has been provided to the Court.

its Servicing Agreement bars it from changing the maturity date of the loan."
(FAC Ex. A at 1).  Counsel then briefly restated Plaintiff's prior two written
requests, before arguing in several paragraphs why Plaintiff believed that
SASCO's servicing agreement with Defendant did not prohibit term extensions.
(*Id.* at 1-3).  The letter ended with Plaintiff's request that Defendant offer a new
permanent modification that included a term extension.  (*Id.* at 3).

Defendant responded by letter dated August 27, 2014.  (FAC ¶ 71 &
Ex. B).  With respect to Plaintiff's request for a new modification, Defendant
responded that it was "unable to alter agreed upon terms to a loan modification
already in place once it's past our discretionary period," and that if Plaintiff
believed she was "unable to afford the … balloon payment, … a new loan
modification can be explored to determine if an alternative would be more
suitable."  (*Id.* Ex. B at 1).  There is no indication in the FAC that Plaintiff took
Defendant up on this offer.

**B.    Procedural History**

Plaintiff filed her complaint in this matter on March 10, 2016.  (Dkt. #1).
In broad summary, Plaintiff claimed that under RESPA, Defendant had
obligations both to substantiate SASCO's refusal to extend the term of her
mortgage and, ultimately, to extend that term.  (FAC ¶¶ 76-86).  Defendant's
failures on both counts amounted to a RESPA violation for which Plaintiff
suffered actual damages; separately, Plaintiff alleged that Defendant's conduct
in responding to her 2014 submissions was part of a "pattern or practice of
improper loan modification denials."  (*Id.* at ¶¶ 87-90).  Finally, Plaintiff alleged

that Defendant's conduct amounted to a violation of N.Y. Gen. Bus. Law § 349, which prohibits consumer-oriented deceptive conduct.  (*Id.* at ¶¶ 91-96).

In May 2016, Defendant announced its intention to file a motion to dismiss the complaint; Plaintiff responded to Defendant's pre-motion submission, and the Court held a conference on the matter on June 1, 2016. (Dkt. #10, 13, 14; *see also* Dkt. #20 (transcript of June 1, 2016 conference)). After the conference, Plaintiff filed a letter motion for leave to file an amended complaint on June 3, 2016; the Court endorsed the motion that day, and accepted the FAC for filing.  (Dkt. #18-19).  Defendant filed its motion to dismiss on July 5, 2016 (Dkt. #22-23); Plaintiff filed her opposition memorandum on August 4, 2016 (Dkt. #24); and briefing was concluded with the submission of Defendant's reply brief on August 25, 2016 (Dkt. #30).

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Loan Servicer Obligations Under Section 6 of RESPA

#### a. Overview

RESPA was enacted "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a); *see generally Kapsis* v. *Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 444-45 (E.D.N.Y. 2013). The statute applies to "federally related mortgage loan[s]," a term that includes loans secured by a lien on residential real estate "designated principally for the

occupancy of from one to four families," for which the lender is federally regulated or has deposits or accounts insured by the federal government. 12 U.S.C. § 2602(1)(A), (B).

In 2010, RESPA was amended pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act" or the "Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010). Among other provisions, Section 1463 of the Dodd-Frank Act added certain sections to RESPA that, generally speaking, addressed the duties of servicers of federally related mortgage loans with regard to responding to borrower requests for information or assertions of error. In addition, the Act created the Consumer Financial Protection Bureau (the "CFPB"), which was tasked with prescribing rules and regulations, as well as interpretations, "as may be necessary to achieve" RESPA's purpose. 12 U.S.C. § 2617(a); *see generally Edwards* v. *First American Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015) (discussing transfer of authority for rulemaking, enforcement, and compliance of RESPA from Department of Housing and Urban Development, or HUD, to CFPB). One such implementing regulation, the Mortgage Servicing Rules (or Regulation X), was repromulgated by the CFPB in 2013 and became effective on January 10, 2014 — after execution of Plaintiff's loan modification documents and prior to Plaintiff's 2014 letters to Defendant. *See Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X)* (hereinafter, "*Mortgage Servicing Rules*"), 78 Fed. Reg. 10696-899 (February 14, 2013) (codified at 12 C.F.R. pt. 1024).

### b.     Servicer Liability Under 12 U.S.C. § 2605(e)

As a practical matter, the typical point of contact for a borrower is the servicer of the loan or mortgage.  These servicers are required under Section 6 of RESPA, which is codified at 12 U.S.C. § 2605, to disclose pertinent information, or to evidence correction of pertinent errors, in writing to borrowers.  *See generally Roth* v. *CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (per curiam); *Friedman* v. *Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 189 (E.D.N.Y. 2014) (citations omitted).  Prior to Dodd-Frank, the principal method for a borrower to obtain information from a servicer was through a "qualified written request" ("QWR") for "information relating to [ ] servicing."  12 U.S.C. § 2605(e)(1)(A).

RESPA defines a QWR as:

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that —
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).  "Servicing," in turn, is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."  *Id.* § 2605(i)(3).

10

"If a[] servicer of a federally related mortgage loan receives a" QWR for servicing information from a borrower or an agent of the borrower, it is required to "provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A). Within 30 days of receipt of that QWR, the servicer is obligated to:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes — (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes — (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

*Id.* § 2605(e)(2).

### c.   Servicer Liability Under 12 U.S.C. § 2605(k) and Regulation Z

Section 1463(a) of the Dodd-Frank Act, entitled "Servicer Prohibitions," added 12 U.S.C. § 2605(k) to RESPA. The section provides, in relevant part:

> A servicer of a federally related mortgage shall not —
>
> (A)   obtain force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance;
>
> (B)   charge fees for responding to valid qualified written requests (as defined in regulations which the Bureau of Consumer Financial Protection shall prescribe) under this section;
>
> (C)   fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;
>
> (D)   fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or
>
> (E)   fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.

12 U.S.C. § 2605(k)(1).  In her opposition papers, Plaintiff claims to be seeking liability under subsections (C) and (E) of this provision (Pl. Opp. 4); a review of the FAC, however, discloses no reference to § 2605(k)(1)(E) (*see* FAC).

In connection with the repromulgation of Regulation Z, the CFPB provided interpretative guidance and implementing regulations.  Of note, the CFPB clarified that servicer obligations under Section 6 of RESPA had been expanded and classified into two types, information-providing and error-correcting:

> As explained in the proposal, the Bureau believed that both borrowers and servicers would be best served if the Bureau were to clearly define a servicer's obligation to correct errors or respond to information requests as required by RESPA sections 6(k)(1)(C) and (D) and the

> RESPA provisions regarding qualified written requests. Thus, the Bureau proposed to establish comprehensive, parallel requirements for servicers to respond to specified notices of error and information requests. The Bureau proposed § 1024.35 to set forth the error resolution requirements that servicers would be required to follow to respond to errors asserted by borrowers. The Bureau proposed § 1024.36 to set forth the information request requirements that servicers would be required to follow to respond to requests for information from borrowers. In doing so, the Bureau intended to establish servicer procedural requirements for error resolution and information requests that are consistent with the requirements applicable to a "qualified written request" that relates to the servicing of a loan under RESPA.

*Mortgage Servicing Rules*, 78 Fed. Reg. at 10736; *see generally Rizk* v. *Residential Credit Solutions, Inc.*, No. CV-14-09371-MWF-JC, 2016 WL 6211727, at *2 (C.D. Cal. Apr. 12, 2016) (discussing two categories). In keeping with this taxonomy, § 1024.35 was captioned "Error resolution procedures," while § 1024.36 was captioned "Requests for information,"

In its Regulation Z guidance, the CFPB made clear that § 1024.35 pertained to putative violations of 12 U.S.C. § 2605(k)(1)(C), while § 1024.36 pertained to putative violations of 12 U.S.C. § 2605(e), (k)(1)(b), and (k)(1)(D). *Compare Mortgage Servicing Rules*, 78 Fed. Reg. at 10741 ("The Bureau proposed § 1024.35(b)(4) to implement, in part, section 6(k)(1)(C) of RESPA with respect to borrower requests to correct errors relating to the allocation of payments for a borrower's account and other standard servicer duties."), *with id.* at 10753 ("Section 1024.36 implements section 6(k)(1)(D) of RESPA, and to

13

the extent the requirements are also applicable to qualified written requests, sections 6(e) and 6(k)(1)(B) of RESPA.").[6]

Plaintiff repeatedly cites to § 1024.35 in the FAC, but nowhere mentions § 1024.36, and so the Court narrows its focus accordingly.  As Plaintiff notes, § 1024.35 covers a broader category of written inquiries from borrowers than the servicing QWRs addressed by 12 U.S.C. § 2605(e)(1):  By its terms, the regulation covers "any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."  12 C.F.R. § 1024.35(a); *cf. id.* ("A qualified

---

[6]     12 U.S.C. § 2605(k)(1)(E), to which Plaintiff refers in her opposition papers but not in her complaint, is also mentioned in the Regulation Z guidance.  A representative reference is the following:

> Finally, section 1463(a) of the Dodd-Frank Act adds section 6(k)(1)(E) to RESPA, which provides that a servicer of a federally related mortgage loan must "comply with any other obligation found by the [Bureau], by regulation, to be appropriate to carry out the consumer protection purposes of this Act."  This provision provides the Bureau authority to establish prohibitions on servicers of federally related mortgage loans appropriate to carry out the consumer protection purposes of RESPA.  As discussed below, in light of the systemic problems in the mortgage servicing industry discussed above, the Bureau is exercising this authority in this rulemaking to implement protections for borrowers with respect to mortgage servicing.

*Mortgage Servicing Rules*, 78 Fed. Reg. at 10703 (footnote omitted); *see also, e.g., id.* at 10714 (adopting § 1024.17(k)(5) pursuant to this authority); *id.* at 10724 ("Pursuant to the Bureau's authorities under RESPA sections 6(k)(1)(E), 6(j)(3), and 19(a), the Bureau proposed rules on error resolution (proposed § 1024.35), information management (proposed § 1024.38), early intervention (proposed § 1024.39), continuity of contact (proposed § 1024.40), and loss mitigation (proposed § 1024.41) that would have set forth servicer duties with respect to "Loss mitigation options.'"); *id.* at 10732 (adopting § 1024.33(c)(2), concerning treatment of borrower payments during transfers of servicing, pursuant to this authority); *id.* at 10736 (adopting § 1024.34(b)(2), concerning the crediting of funds to a new escrow account, pursuant to this authority); *id.* at 10768 (adopting disclosure obligations concerning force-placed insurance pursuant to this authority); *id.* at 10777-78 (adopting certain "[g]eneral [s]ervicing [p]olicies, [p]rocedures, and [r]equirements" pursuant to this authority).

14

written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request.").

That said, the scope of this regulation is not unlimited, but rather pertains only to certain enumerated "covered errors," which include:

> (1) Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments.
>
> (2) Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law.
>
> (3) Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of 12 CFR 1026.36(c)(1).
>
> (4) Failure to pay taxes, insurance premiums, or other charges, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay, in a timely manner as required by § 1024.34(a), or to refund an escrow account balance as required by § 1024.34(b).
>
> (5) Imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower.
>
> (6) Failure to provide an accurate payoff balance amount upon a borrower's request in violation of section 12 CFR 1026.36(c)(3).
>
> (7) Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39.
>
> (8) Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer.
>
> (9) Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(f) or (j).

(10) Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j).

(11) Any other error relating to the servicing of a borrower's mortgage loan.

*Id.* § 1024.35(b).  The regulation goes on to specify "[i]nvestigation and response requirements" — including time limitations and documentation obligations — for affected loan servicers.  *Id.* § 1024.35(e).

### d.   Alleging Damages Under Section 6 of RESPA

A servicer who "fails to comply with any provision of" Section 6 is subject to actual damages, costs, and, "in the case of a pattern or practice of noncompliance with the requirements of [Section 2605]", statutory damages. 12 U.S.C. § 2605(f); *see Gorbaty* v. *Wells Fargo Bank, N.A.*, 10 Civ. 3291 (NGG) (SMG), 2012 WL 1372260, at *5 (E.D.N.Y. Apr. 18, 2012).  Significantly, "[a] plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA."  *Gorbaty*, 2012 WL 1372260, at *5.  Conclusory assertions do not suffice.  *See, e.g.*, *Gorbaty* v. *Wells Fargo Bank, N.A.*, No. 10 Civ. 3291 (NGG) (SMG), 2014 WL 4742509, at *5 (E.D.N.Y. Sept. 23, 2014) ("In order to recover actual damages, a plaintiff must allege injury and resulting damages that are proximately caused by the loan servicer's failure to adhere to its obligations under § 2605 — i.e., the timing and form of Wells Fargo's responses to Plaintiff's QWRs."); *Corazzini* v. *Litton Loan Servicing LLP*, No. 09 Civ. 199 (MAD) (ATB), 2010 WL 6787231, at *12 (N.D.N.Y. June 15, 2011) ("[T]he courts have consistently dismissed complaints under RESPA if they do not allege actual

16

damages or state merely that in a conclusory fashion the defendant caused damages to the plaintiff[.]" (citation and internal quotation marks omitted)).

To obtain statutory damages, by contrast, a plaintiff must establish "a pattern or practice of noncompliance with the requirements" of § 2605 by the defendant.  12 U.S.C. § 2605(f)(1).  "Pattern or practice means a standard or routine way of operating."  *Gorbaty*, 2012 WL 1372260, at *5 (citation and internal quotation marks omitted).  Though there is no set number of violations needed to plead "a pattern or practice of noncompliance," "courts have held that two violations of RESPA are insufficient to support a claim for statutory damages."  *Kapsis*, 923 F. Supp. 2d at 445 (collecting cases); *see Gorbaty*, 2012 WL 1372260, at *5; *cf. Fournier* v. *Bank of Am. Corp.*, No. 5:13-CV-00702, 2014 WL 421295, at *4 (N.D.N.Y. Feb. 4, 2014) ("In light of Plaintiff's allegation that 'Defendants are regularly engaged in the servicing of residential mortgages,' dkt. #1 ¶ 8, the Court agrees with Defendants that three instances of noncompliance with RESPA is insufficient to establish a pattern or practice of noncompliance, particularly where Defendants responded to Plaintiff's fourth alleged QWR in a timely manner.").

**B.    Plaintiff Has Failed to Plead a Cognizable RESPA Violation**

At base, Plaintiff seeks to use RESPA and Regulation X to renegotiate her loan modification.  That is, Plaintiff is not contending that Defendant acted in derogation of the modification agreement she executed in October 2013; instead, she contends that the modification was itself implemented in error because it lacked a term extension.  Framing her claims in the language of

17

RESPA, Plaintiff faults Defendant for not sufficiently responding to her requests for information concerning why a term extension was not included in her loan modification (i.e., not substantiating SASCO's refusal to include a term extension), and for not "correcting" the error of failing to include a term extension.  (*See* FAC ¶¶ 76-84).  Plaintiff has very carefully pled the FAC in an effort to circumvent various RESPA provisions that foreclose a private right of action for certain claims; ultimately, the Court concludes that Plaintiff's pleading gambit is unsuccessful, and grants Defendant's motion to dismiss.

### 1.   Plaintiff Does Not Allege a Viable Claim Under 12 U.S.C. § 2605(e)

The Court first considers Defendant's liability under 12 U.S.C. § 2605(e).[7]  The FAC and Plaintiff's opposition memorandum predicate liability under this provision on Plaintiff's August 2014 letter alone.  (*See* FAC ¶ 82 ("Having failed to either correct the account or explain why the account was correct, Citi's response to the August 1, 2014 QWR violated 12 U.S.C. § 2605(e)(2)."); Pl. Opp. 4 ("First, Ms. Sutton's Third QWR is covered by RESPA, and Citi had a duty to respond to it.")).  Because the August 2014 letter incorporated Plaintiff's two prior submissions, however, the Court has considered all three submissions.  Reviewing the allegations in the FAC, the Court agrees with Plaintiff that her letters of February, May, and August 2014 are "qualified written requests" under 12 U.S.C. § 2605(e)(2).  That is, however, only half of the equation:  Plaintiff must also demonstrate that the QWRs seek

---

[7]      To reiterate, because Plaintiff nowhere suggests in her FAC or opposition memorandum that she is relying on 12 C.F.R. § 1024.36, the Court does not consider that regulation.

"information relating to the servicing of such loan" under § 2605(e)(1), and it is here where the pleadings founder.[8]

Defendant states that it responded to many of the requests in Plaintiff's letters. (*See* Def. Br. 9-12). The Court agrees, and concludes that the only requests to which Defendant did not respond were the requests in the May and August letters for "specific language in the SASCO servicing agreement that restricts mortgage loan term extension" (FAC ¶ 64; *see also id.* at Ex. A), and the requests in the August letter that Defendant "offer[] a new permanent modification . . . including term extension" or provide a valid explanation why it could not (*id.* at Ex. A). None of these requests, however, relates to servicing, which is defined in Section 6 to include "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

Both before and after the Dodd-Frank amendments, courts consistently distinguished loan servicing inquiries from loan modification inquiries, and

---

[8]     Plaintiff asks the Court to focus on the definition of a QWR in 12 U.S.C. § 2605(e)(2), which definition does not include a reference to servicing (*see* Pl. Opp. 5), and argues further that she is "alleg[ing] a violation of 12 U.S.C. § 2605(e)(2), which is not limited to errors relating to servicing" (*id.*). The Court, however, agrees with Defendant (*see* Def. Reply 1) that Plaintiff may not disaggregate § 2605(e)(2) from § 2605(e)(1), which makes plain that RESPA's servicer obligations under that subsection pertain only to QWRs seeking "information relating to the servicing of such loan." *Cf. Medrano* v. *Flagstar Bank, FSB*, 704 F.3d 661, 666 n.4 (9th Cir. 2012) ("Instead, that requirement [that the borrower's request pertain to "information relating to servicing"] derives from § 2605(e)(1)(A), which requires, as conditions for triggering the duty to respond, both (1) that the letter is a qualified written request and (2) that it requests information relating to servicing.").

have concluded that liability under § 2605(e)(1) does not inhere in the latter. *See, e.g.*, *Gorbaty*, 2014 WL 4742509, at *7 ("[C]ourts routinely interpret section 2605 as requiring a QWR to relate to the servicing of a loan, rather than the creation or modification of a loan." (quoting *Gates* v. *Wachovia Mortg., FSB*, No. 09-CV-02464 (FCD), 2010 WL 2606511, at *3 (E.D. Cal. June 28, 2010))); *Bravo* v. *MERSCORP, Inc.*, No. 12 Civ. 884 (ENV) (LB), 2013 WL 1652325, at *3 (E.D.N.Y. Apr. 16, 2013) (distinguishing "communication[s] challenging the validity of the loan" from "communication[s] relating to the servicing of the loan as defined by statute"); *see also, e.g.*, *Bracco* v. *PNC Mortg.*, No. 8:16-CV-1640-T-33TBM, 2016 WL 4507925, at *4 (M.D. Fla. Aug. 29, 2016) ("The distinction between 'servicing' a loan and 'modifying' a loan is an important one because '[c]ourts routinely interpret section 2605 as requiring a QWR to relate to the servicing of a loan, rather than the creation or modification of a loan.'" (citation omitted) (collecting cases)); *Wolfbauer* v. *Ocwen Loan Servicing, LLC*, No. 4:15CV3141, 2016 WL 1170982, at *3 (D. Neb. Mar. 24, 2016) ("An inquiry about the validity, ownership, transfer, assignment, or potential modification of a loan is not 'related to the servicing' of the loan and does not constitute a QWR." (collecting cases)); *see generally Smallwood* v. *Bank of Am., N.A.*, No. 1:15-CV-336, 2015 WL 7736876, at *6 (S.D. Ohio Dec. 1, 2015) ("The plain language of the statute supports Defendant's position that a request relating to loan modification does not relate to scheduled payments, principal and interest, or other payments received pursuant to the terms of the Smallwoods' loan with BOA.  Rather, a loan

modification is a request to alter the terms of a loan."), *appeal dismissed* (June 13, 2016).[9]

The inquiries about which Plaintiff complains cannot support liability for Defendant under § 2605(e)(1).  Reviewing the submissions and their responses, Defendant provided information to Plaintiff that related to the servicing of her mortgage, and the information that it is alleged Defendant did not provide was not related to servicing.  The same result obtains if these inquiries are framed as requests for error correction rather than information; the claimed corrections relate to loan modifications and not servicing.  In sum, Plaintiff's argument depends on an impermissible disaggregation of the relevant statutory provision, and fails on this basis.

### 2. Plaintiff Cannot Allege a Viable RESPA Claim Based on the Dodd-Frank Amendments

Plaintiff fares no better under the statutory and regulatory amendments resulting from the Dodd-Frank Act.  In this regard, Plaintiff claims that Defendant failed to correct certain errors in her account that were brought to Defendant's attention in Plaintiff's May and August 2014 submissions; though presented in various formulations, the proffered errors are variations on a theme that Defendant erred in not extending the term of Plaintiff's mortgage loan.  (*See, e.g.*, FAC ¶¶ 12 ("Citi did not properly investigate Ms. Sutton's

---

[9]     Several of the decisions reviewed by the Court appear to commit the conflation error identified in *Medrano*, *see* n.8, *supra*, in that they define QWR to relate exclusively to servicing issues.  Having carefully reviewed the decisions, the Court understands that these courts in fact considered whether the challenged inquiries constituted actionable QWRs — i.e., QWRs about servicing issues — that would trigger a duty on the part of the servicer-recipient to respond under RESPA, and interprets their analyses accordingly.

mortgage account for errors, even though Ms. Sutton demonstrated that Citi's professed reason for refusing to extend the term of her loan was entirely unfounded."), 72 ("No rule or regulation relieves Citi of its duty to correct the error it made when it permanently modified Ms. Sutton's loan.  The excuse Citi offered — that it could not alter the terms of accepted loan modifications — is not recognized under the Handbook, which governs HAMP, or Regulation X, which implements RESPA."), 82 ("Citi did not correct Ms. Sutton's account by extending the maturity date of her loan, even though HAMP requires that Citi extend the term of Ms. Sutton's loan and Citi faced no prohibition on doing so."), 83 ("Upon information and belief, Citi did not conduct a reasonable investigation into the error alleged in Ms. Sutton's August 1, 2014 QWR.")).  As set forth herein, Plaintiff has not alleged a viable claim under either 12 U.S.C. § 2605(k)(1)(C) or 12 C.F.R. § 1024.35.

Despite the Court's request at the pre-motion conference (*see* June 1 Tr. 41), Defendant elected not to corroborate its February 28 written response to Plaintiff that SASCO's "guidelines" foreclosed a term extension (Ltr. Ex. C). [10] This reticence potentially complicates the Court's analysis.  Plaintiff's error-correction claims, as noted, largely proceed from her belief that, under the HAMP handbook that governed Defendant's conduct with respect to Plaintiff's loan modification (*see* FAC ¶ 33), Defendant was permitted to extend the term

---

[10]    It is perhaps the case that Defendant was concerned that introduction of such information would not be permissible on a motion to dismiss.  *See generally Goel* v. *Bunge*, 820 F.3d 554, 558-60 (2d Cir. 2016) (discussing materials that may properly be considered on a Rule 12(b)(6) motion.

of Plaintiff's mortgage and erred in not so doing.  However, Plaintiff has not simply incanted that Defendant acted in error, but has presented detailed allegations that call into question whether SASCO's guidelines operated in the manner that Defendant reported to her, and, more importantly, whether the guidelines *could* lawfully have operated in that manner.  Because Defendant has not presented evidence substantiating its position that SASCO's guidelines were a bar, the Court cannot exclude the possibility that Plaintiff's loan modification was entered in error (or, put somewhat differently, that her claims of error were themselves made in error).  Whether that has legal significance under the particular provisions cited by Plaintiff is discussed in the remainder of this section.

### a.    Plaintiff Has Not Stated a Claim Under 12 U.S.C. § 2605(k)(1)(C)

Plaintiff claims liability under Section 2605(k)(1)(C), under which servicers of federally related mortgages are proscribed from "fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties."  12 U.S.C. § 2605(k)(1)(C).  Defendant correctly notes that Plaintiff's submissions cannot be said to fall within the first three categories.  (*See* Def. Br. 7).  Accordingly, resolution of this contention requires the Court to determine whether Plaintiff's requests for substantiation of SASCO's loss mitigation guideline or her claims of error requiring correction relate to "standard servicer's duties."

Plaintiff argues that "standard servicer's duties" are not limited (as Defendant suggests, *see* Def. Br. 7-8) to errors actionable under other sections of RESPA, but rather encompass duties "typically undertaken by servicers in the ordinary course of business," including "'loss mitigation activities.'" (Pl. Opp. 5-6 (quoting *Mortgage Servicing Rules*, 78 Fed. Reg. at 10699, 10739)). Because of the recency of Dodd-Frank, there is scant case law on this issue. Indeed, while the Court has found cases addressing § 2605(k)(1)(C), *see, e.g.*, *Boardley* v. *Household Fin. Corp. III*, 39 F. Supp. 3d 689, 703-04 (D. Md. 2014), it has found only one case that gave more than a passing nod to "standard servicer's duties," *see Todd* v. *ShoreBank*, No. 12 Civ. 6575 (JBZ), 2013 WL 3790966, at *4 (N.D. Ill. July 19, 2013). Even there, the district court did not consider the scope of the term, but rather used it in concluding that "[i]ssues of the validity of a loan or mortgage documents do not relate to loan servicing," and thus that an inquiry concerning same "is not a valid QWR." *Id.*

In consequence, the Court considers the CFBP's statements at the time of the repromulgation of Regulation X. The Second Circuit has not discussed the deference to be accorded to the CFBP's (as opposed to HUD's) interpretation of RESPA and Regulation X, but the Ninth Circuit has in language that comports with pre-Dodd-Frank Second Circuit decisions concerning HUD interpretations of RESPA:

> As a threshold matter, we must consider the proper level of deference to be given to the agency interpretation. Our analytical framework depends on whether the agency is interpreting the statute or the regulation. An agency's interpretation of an ambiguous statute is entitled to *Chevron* deference when the

> interpretation is promulgated in the exercise of the agency's formal rule-making authority. *See Chevron, U.S.A., Inc.* v. *Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation of its own ambiguous regulation is generally entitled to *Auer* deference.   *See Auer* v. *Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L.Ed.2d 79 (1997) (holding that an agency's interpretation of its own ambiguous regulation is controlling unless "plainly erroneous or inconsistent with the regulation") (internal citation omitted).

*Edwards* v. *First Am. Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015), *cert. dismissed sub nom. First Am. Fin. Corp.* v. *Edwards*, 136 S. Ct. 1533 (2016); *see Nat. Res. Def. Council* v. *U.S. E.P.A.*, 808 F.3d 556, 569 (2d Cir. 2015) (discussing agency deference generally); *Cohen* v. *JP Morgan Chase & Co.*, 498 F.3d 111, 113 (2d Cir. 2007) (according *Chevron* deference to HUD's interpretation of 12 U.S.C. § 2607(b)); *Kruse* v. *Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 59 (2d Cir. 2004) (same).

The CFPB offered the following guidance concerning the scope of 12 U.S.C. § 2605(k)(1)(C):

> Section 6(e) of RESPA requires servicers to respond to "qualified written requests" asserting errors or requesting information relating to the servicing of a federally-related mortgage loan.  Section 1463(a) of the Dodd-Frank Act amended RESPA to add section 6(k)(1)(C), which states that a servicer shall not "fail to take timely action to respond to a borrower's request to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." ... These standard servicer duties are not limited to duties that constitute "servicing," as defined in this rule, and include, for example, duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance

> (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, *and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans.*

*Mortgage Servicing Rules*, 78 Fed. Reg. at 10739 (emphasis added) (footnote omitted); *see also id.* at 10699 (including within servicer duties "defining loss mitigation activities (including foreclosures and loan modifications) with respect to delinquent borrowers)"); *cf.* 12 C.F.R. § 1024.39 (establishing servicer obligation to engage in early intervention efforts with delinquent borrowers).  Plaintiff's FAC and opposition papers confirm that she never defaulted on her mortgage payments and was never delinquent in her payments.  There is, therefore, nothing to suggest that "standard servicer's duties" included fielding Plaintiff's requests for loan modifications.[11]

### b.    Plaintiff Has Not Stated a Claim Under 12 C.F.R. § 1024.35

#### i.    Overview of Plaintiff's Arguments

Plaintiff further contends in her opposition papers that liability exists under Section 2605(k)(1)(E), which proscribes "fail[ing] to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."  12 U.S.C. § 2605(k)(1)(E).  (*See* Pl. Opp. 4).  As noted previously,

---

[11]    This conclusion is bolstered by the Court's analysis of 12 C.F.R. § 1024.41 in the next section.  Also, to the extent that Plaintiff's claim under 12 U.S.C. § 2605(k)(1)(C) is expanded by 12 C.F.R. § 1024.35, the Court considers the latter claim as a standalone basis of liability in the next section.

the FAC makes no reference to § 2605(k)(1)(E).  It does, however, make numerous references to 12 C.F.R. § 1024.35, the provision of Regulation Z that sets forth error resolution procedures for various "covered errors."   In her opposition papers, Plaintiff reiterates that errors in evaluation of loss mitigation options are included within the list of "covered errors."  (*See, e.g.*, Pl. Opp. 7-8). The Court will therefore consider whether Plaintiff has alleged a claim under § 1024.35.

On this issue, the dispute between the parties distills to whether communications by a non-defaulting party (such as Plaintiff here) identifying and seeking correction of putative loss mitigation errors are covered by this provision.  In arguing the negative, Defendant cites to the CFPB's explicit declination "to add a servicer's failure to correctly evaluate a borrower for a loss mitigation option as a covered error" in the final rule.  (Def. Br. 9 (quoting *Mortgage Servicing Rules*, 78 Fed. Reg. at 10744)).  Plaintiff counters that such specificity was tabled in favor of a catch-all provision that necessarily encompassed loss mitigation errors.  (Pl. Opp. 7-10).  Each side musters several non-precedential decisions to support its position; the Court has reviewed them, as well as the CFPB's comments, and it concludes that Defendant has the better of the argument.

Significantly for purposes of the Court's analysis, Plaintiff has specifically disclaimed (*see* Pl. Opp. 11) any argument under 12 C.F.R. § 1024.41, which sets forth a detailed system of loss mitigation procedures.  *See* 12 C.F.R. § 1024.41; *see generally Lage* v. *Ocwen Loan Servicing LLC*, 145 F. Supp. 3d

1172, 1182 (S.D. Fla. 2015), *aff'd*, 839 F.3d 1003 (11th Cir. 2016) (per curiam).

At first blush, this section would seem to be the most relevant to Plaintiff's

claims, but the Court understands Plaintiff's decision to disclaim to be a

strategic one in light of the limitations on a borrower's private right of action:

> **Enforcement and limitations:** A borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f)). *Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option.* Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law.

12 C.F.R. § 1024.41(a) (emphasis added).

### ii.   The Court Will Assume That a Private Right of Action Exists Under 12 C.F.R. § 1024.35

Having identified Plaintiff's arguments, the Court next considers whether

a private right of action exists under 12 C.F.R. § 1024.35. Plaintiff

acknowledges that two courts in this Circuit have declined to so find. (*See* Pl.

Opp. 6 n.3 (citing *Miller* v. *HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500 (RWS),

2015 WL 585589 (S.D.N.Y. Feb. 11, 2015), and *Kilgore* v. *Ocwen Loan

Servicing, LLC*, 89 F. Supp. 3d 526 (E.D.N.Y. 2015))). However, Plaintiff argues

that those decisions were largely the product of poor pleading by the plaintiffs'

counsel (who was the same in both cases), and should not be considered

persuasive. (*Id.*).

The analysis in *Miller* is not as cursory as Plaintiff's briefing suggests: Judge Sweet concluded, after reviewing the regulation, that "[b]ecause Section 1024.35 includes the remedies available, and because a private right of action for alleged damages is not among them, Miller's notice of error claim is rejected." 2015 WL 585589, at *11 (citing *Nat'l R.R. Passenger Corp.* v. *Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies")); *cf. Brown* v. *Bank of N.Y. Mellon*, No. 1:16-CV-194(LMB/IDD), 2016 WL 2726645, at *2 (E.D. Va. May 9, 2016) ("With respect to plaintiff's Regulation X claims in Counts II-V, defendants correctly argue that 12 C.F.R. §§ 1024.35, 1024.39, and 1024.40 do not explicitly provide a cause of action to private individuals."). That said, the Court's own review of the case law discloses a split among courts. *See, e.g.*, *Lage* v. *Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1007 (11th Cir. 2016) (recognizing private right of action for violations of § 1024.35); *see generally Payne* v. *Seterus Inc.*, No. CV 16-0203, 2016 WL 6270761, at *6 (W.D. La. Oct. 26, 2016) (discussing split).

For its part, the CFBP has stated that "regulations established pursuant to section 6 of RESPA are subject to section 6(f) of RESPA, which provides borrowers a private right of action to enforce such regulations." *Mortgage Servicing Rules*, 78 Fed. Reg. at 10714 n.64. The Court will assume, for purposes of this motion, that such a private right of action exists, given the CFPB's statements, the remedial purposes of RESPA and Regulation X, and the

provision of a private right of action in 12 U.S.C. § 2605(k)(1)(E) (through
§ 2605(f)), for "fail[ures] to comply with any other obligation found by the
Bureau of Consumer Financial Protection, by regulation, to be appropriate to
carry out the consumer protection purposes of this chapter").

### iii.   Plaintiff Has Not Alleged a "Covered Violation"

But though Plaintiff has the ability to bring a claim under this Dodd-
Frank amendment, the claim she has alleged is not a viable one.  Considering
Plaintiff's allegations in this regard, the Court finds that, while stated in
slightly different ways in the FAC and in Plaintiff's opposition papers, the
putative errors are of one type — Defendant's failure to recognize and correct
the fundamental error in the loan it was then servicing, i.e., its erroneous
perception that Plaintiff could not have obtained a loan modification with a
term extension.

In light of (i) the recency of the Dodd-Frank amendments, (ii) the unusual
facts alleged here, and (iii) the statutes and regulations under which Plaintiff
does (and does not) proceed, the Court finds little guidance in the existing case
law.  The court in *Rizk* v. *Residential Credit Solutions, Inc.*, No. CV-14-09371-
MWF-JC, 2016 WL 6211727 (C.D. Cal. Apr. 12, 2016), granted summary
judgment in favor of the defendant mortgage servicer on various bases,
including its determination that "QWRs may not be used to request loan
modification or information related to loan modification."  *Id.* at *3.  However,
though the plaintiff's written inquiries post-dated January 10, 2014, the
district court relied exclusively on pre-Dodd-Frank case law.  The plaintiffs in

*Smallwood* v. *Bank of America, N.A.* had submitted inquiries to their mortgage servicer concerning, among other things, a possible loan modification (and their concurrent belief that their account was in error because of the failure to implement such a modification) both before and after January 10, 2014; the plaintiffs (like Plaintiff here) alleged violations of 12 U.S.C. § 2605(e)(2) and 12 C.F.R. § 1024.35, among others.  2015 WL 7736876, at *1-4.  Again, however, the district court focused on pre-Dodd-Frank case law in concluding that the defendant servicer was not required to respond to inquiries relating to loan modification under RESPA, because they did not pertain to servicing, and, further, rejected the argument that "sections of Regulation X that reference loss mitigation were intended to expand the definition of 'servicing' under RESPA." *Id.* at *7; *see also id.* n.13.[12]  The plaintiffs in *Smallwood*, however, appear not to have argued for liability under 12 U.S.C. § 2605(k)(1)(C) or (E).

By contrast, the district court in *Cole* v. *JPMorgan Chase Bank, N.A.*, No. 2:15-CV-2634, 2016 WL 4491731 (S.D. Ohio Aug. 25, 2016), denied the defendant servicer's motion to dismiss, finding that pre-Dodd-Frank cases were no longer persuasive authority.  *Id.* at *6-7, *13.  However, the court there noted that the plaintiff was claiming errors during the process of seeking a loan modification, and concluded that "a borrower may enforce the provisions of 12

---

[12]   Other courts have come to similar conclusions about post-Dodd-Frank Act claims relying on *Smallwood*.  *See, e.g.*, *Hudgins* v. *Seterus, Inc.*, — F. Supp. 3d —, No. 16-CV-80338, 2016 WL 3636859, at *5 (S.D. Fla. June 28, 2016) ("The Court, therefore, rejects Plaintiff's position that the implementation of Regulation X invalidated the many decisions described herein.  Relying on those decisions, the Court holds that a request for loan modification information does not suffice to bring a claim under § 2605(k)(1)(E) of RESPA, if premised on a failure to comply with § 1024.36(d)(2)(i)(B) [the timetable provisions] of Regulation X.").

31

C.F.R. § 1024.41 (loss mitigation procedures) pursuant to section 6(f) of RESPA (12 U.S.C. § 2605(f)).” *Id.* at *7; *see also id.* at *9 (addressing plaintiff's arguments regarding § 1024.41). Similarly, in *Bracco* v. *PNC Mortgage*, No. 8:16-CV-1640-T-33TBM, 2016 WL 4507925, at *4 (M.D. Fla. Aug. 29, 2016), the court dismissed a complaint that sought to predicate violations of § 2605(k) of RESPA and § 1024.36 of Regulation X on the servicer's untimely acknowledgement of receipt of the plaintiff's request for information. *Id.* at *2-6. In so doing, the court distinguished two cases that had sustained claims under Regulation X, noting that “each included a claim under the loss mitigation provision of Regulation X at 12 C.F.R. § 1024.41, rather than a sole claim under 12 C.F.R. § 1024.36.” *Id.* at *4 (citing *Bennett* v. *Bank of Am., N.A.*, 126 F. Supp. 3d 871 (E.D. Ky. 2015), and *Paz* v. *Seterus, Inc.*, No. 14-62513-CIV, 2015 WL 4389521 (S.D. Fla. July 16, 2015)). Ultimately, the *Bracco* court concluded that “[a]lthough [the plaintiff] may be correct that ‘there is no one else but a servicer to direct inquiries about how badly botched an attempted loan modification was,’ Regulation X's requirements governing a servicer's response to loss mitigation applications are found in § 1024.41, not in § 1024.36(c).” *Id.* (citation omitted). In the instant case, of course, Plaintiff has disclaimed any reliance on § 1024.41. In short, existing case law suggests that Plaintiff has failed to state a claim under the Dodd-Frank amendments. Seeking additional clarity, however, the Court will also consider the CFPB's pronouncements on this issue.

Both parties are correct with their opening premises: the CFPB *did* decline to include incorrect evaluations of loss mitigation options as a covered category, and it *did* decide to include a catch-all provision for "error[s] relating to the servicing of a borrower's mortgage loan" in 12 C.F.R. § 1024.35(b)(11).  It is the CFPB's description of the process it went through to arrive at these two decisions that persuades the Court that errors in evaluation of loss mitigation options are not subsumed by this catch-all provision:

> [T]he Bureau solicited comment regarding whether the list of covered errors should include a catch-all provision.  The Bureau also requested comment as to whether to add additional specific errors to the list of errors under § 1024.35.  In particular, the Bureau solicited comment regarding whether to include as an error a servicer's failure to correctly evaluate a borrower for a loss mitigation option.
>
> [summarizing comments received]
>
> As noted in the proposal, the Bureau believes that the appeals process set forth in § 1024.41(h) provides an effective procedural means for borrowers to address issues relating to a servicer's evaluation of a borrower for a loan modification program.  For this reason, and the reasons stated below with respect to loss mitigation practices, the Bureau declines to add a servicer's failure to correctly evaluate a borrower for a loss mitigation option as a covered error in the final rule.

*Mortgage Servicing Rules*, 78 Fed. Reg. at 10743-44; *see also id.* at 10739-40 (emphasizing that the list of covered errors is a "limited list").

The CFPB's discussion of § 1024.41 confirms the Court's conclusion:

> The Bureau does not believe that it can develop, at this time, rules that are sufficiently calibrated to protect the interests of all parties involved in the loss mitigation process and is concerned that an attempt to do so may have unintended negative consequences for consumers and the broader market.  Loss mitigation programs have

evolved significantly since the onset of the financial crisis and the Bureau is concerned that an attempt to mandate specific loss mitigation outcomes risks impeding innovation, that would allow such programs to evolve to the needs of the market. The Bureau further believes that if it were to attempt to impose substantive loss mitigation rules on the market at this time, consumers' access to affordable credit could be adversely affected.

\* \* \*

The Bureau is implementing requirements, however, for servicers to evaluate borrowers for loss mitigation options pursuant to guidelines established by the owner or assignee of a borrower's mortgage loan. In order to effectuate this policy, the Bureau has created certain requirements in § 1024.38, with respect to general servicing policies, procedures, and requirements, and other requirements in connection with the loss mitigation procedures in § 1024.41…. Borrowers have a private right of action to enforce the procedural requirements in § 1024.41, as set forth in § 1024.41(a); borrowers do not, however, have a private right of action under the Bureau's rules to enforce the requirements set forth in § 1024.38 or to enforce the terms of an agreement between a servicer and an owner or assignee of a mortgage loan with respect to the evaluation of borrowers for loss mitigation options. *The Bureau believes this framework provides an appropriate mortgage servicing standard; servicers must implement the loss mitigation programs established by owners or assignees of mortgage loans and borrowers are entitled to receive certain protections regarding the process (but not the substance) of those evaluations.*

*Mortgage Servicing Rules*, 78 Fed. Reg. at 10817-18 (emphasis added); *see also id.* at 10823 (confirming that private right of action exists under 12 C.F.R. § 1024.41 for violation of loss mitigation procedures, but not for failure "to offer any particular loan mitigation option").[13]

---

[13]     Plaintiff does not claim error in the process by which her inquiries were submitted and responded to, but rather to the substance of those responses (or, in some cases, non-

There are additional policy reasons for the Court to decline to read "covered errors" as broadly as Plaintiff suggests.  For one thing, recognizing a cause of action under RESPA on the allegations in the FAC would undermine the settled principle that there is no private right of action for HAMP violations. *See Jordan* v. *Chase Manhattan Bank*, 91 F. Supp. 3d 491, 501-02 (S.D.N.Y. 2015) (collecting cases); *Wheeler* v. *Citigroup*, 938 F. Supp. 2d 466, 471 (S.D.N.Y. 2013) (same).  Indeed, recognizing a cause of action on these facts would undermine RESPA itself, which sets forth a carefully-calibrated set of protocols addressing loss mitigation issues, one under which Plaintiff's allegations fail to state a claim.  On this factual record — where Defendant was servicing properly the very loan modification to which Plaintiff had knowingly and voluntarily agreed; where there were no factual developments between Plaintiff's execution of her loan modification and her submission of written inquiries protesting one of its terms; where Plaintiff was invited by Defendant in August 2014 to inquire about a new loan modification; and where there is no indication that Plaintiff would be foreclosed from applying for such a modification in accordance with § 1024.41 — the Court cannot countenance Plaintiff's efforts at an end-run around RESPA.

In short, the Court agrees with Defendant that RESPA (through Regulation X) regulates many aspects of loss mitigation practices, but does not regulate the correctness of a loss mitigation decision, and certainly does not

---

responses).  She cannot now recast her argument as a procedural failing, particularly given her strategic eschewal of § 1024.41.

encompass errors in loss mitigation decisions within the catch-all provision in the definition of "covered errors." (*See* Def. Reply 2). For all of these reasons, the Court finds that Plaintiff has failed to allege an actionable claim under RESPA.[14]

## C.     Plaintiff Has Not Alleged Damages That Were Proximately Caused by Any RESPA Violation

Even had Plaintiff alleged a violation of RESPA, she has failed to identify damages that were proximately caused by that violation, and her claims would fail on this independent basis. To review, the purported RESPA violations generally concern Defendant's failure to provide substantiation for its refusal to extend the term of Plaintiff's mortgage and to "correct" its error in not extending the mortgage. In the FAC, Plaintiff alleges four categories of damages:

> a) Ms. Sutton has suffered the financial damage of having a balloon payment of over $197,730.14 due on March 1, 2019 rather than paying this sum over an extended term;
>
> b) Ms. Sutton has suffered the financial damage of making monthly mortgage payments in excess of the rent she otherwise would pay, towards a home that she will ultimately lose to foreclosure if Citi does not extend the term of the loan;
>
> c) Ms. Sutton has suffered emotional distress as a result of the uncertainty of her situation and because the

---

[14]     Far subsidiary to Plaintiff's failure-to-correct-or-extend claim is a claim that "Citi's responses to both the February 2014 QWR and the August 2014 QWR do not include statements that Ms. Sutton is entitled to request the documents that Citi relied upon, nor do they include information regarding how Ms. Sutton could request those documents." (FAC ¶ 85 (citing 12 C.F.R. § 1024.35(e)(1)(i)(B))). Even were this Court to find that Plaintiff had a private right of action stemming from this omission, Plaintiff has not alleged a causal connection between this omission and the damages she claims to have suffered, using the analysis set forth in the next section.

> looming balloon payment threatens her long-term
> ownership of her Home; and
>
> d) Ms. Sutton has suffered incidental costs related to
> the sending of correspondence to Citi, such as postage
> and travel to her attorney's office.

(FAC ¶ 87).

As noted, "[a] plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA." *Gorbaty*, 2012 WL 1372260, at *5. With this in mind, and taking her claims out of order, the Court dismisses Plaintiff's fourth category of damages out of hand. To permit a cause of action based on incidental costs would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits, and, in so doing, would subvert the very reason for the damages requirement in the first place. *Cf. Marais* v. *Chase Home Fin.*, LLC, 24 F. Supp. 3d 712, 727 (S.D. Ohio 2014) ("In other words, courts in this circuit and district have previously found that the costs of preparing and sending a QWR, as well as costs of filing suit to enforce RESPA, do not satisfy the actual damages requirement." (collecting cases)).

Plaintiff's second category of damages can also be rejected. For starters, Plaintiff's claim to have paid more in mortgage payments than in rent is speculative, inasmuch as there is no allegation in the FAC of any rental opportunity that Plaintiff forwent in favor of continued mortgage payments. To counter speculation with speculation, the Court observes that Plaintiff's argument further depends on her abandoning any equity she may have in the home at the time the balloon payment becomes due in March 2019, rather

37

than attempting to obtain a second modification, or selling the home, in the 26 months preceding that date. More fundamentally, Plaintiff has failed to allege a causal connection. Plaintiff's decision to choose home ownership over home rental was made in 2001 and reaffirmed in October 2013, months before the communications that are at the heart of this lawsuit. Indeed, Plaintiff made mortgage payments for months with full knowledge of the March 2019 balloon payment she now seeks to avoid; thus, even were the Court to conclude that Defendant was required to substantiate its reason for refusing to extend the term of the loan or to extend the term, Plaintiff cannot allege that either error affected her decision to own and not rent.

Turning to the issue of emotional distress damages, courts have split as to whether such damages count as actual damages under RESPA. *See, e.g., In re Residential Capital*, LLC, 513 B.R. 446, 465 (Bankr. S.D.N.Y. 2014) (collecting cases on both sides, and concluding that emotional distress damages can constitute "actual damages" under RESPA). A review of the facts found by Judge Glenn in *Residential Capital*, however, underscores the difference between that case and this one: the former case involved foreclosure proceedings undertaken by the servicer in response to a request for a loan modification and in the absence of the borrowers' default; the retention of a scurrilous (and later disbarred) attorney to commence the proceedings in the name of the trustee of the securitization trust that owned the loan; repeated refusals by the servicer to explain who the trustee was and why foreclosure proceedings had been commenced; and, most disturbingly, the overdose (and

consequent death) of one of the homeowners caused by the stress of the proceedings. Here, by contrast, the FAC makes plain that Plaintiff's distress has existed "since signing the permanent modification agreement" in October 2013 (FAC ¶ 75) — again, several months before any of Plaintiff's 2014 inquiries was submitted. Plaintiff cannot disentangle the distress that was occasioned by the loan modification into which she voluntarily entered from that which may have been occasioned by Defendant's failure to respond fully to any of her requests for information or to modify the term of the mortgage, and for this reason has not alleged actionable emotional distress damages. *See Roth*, 2013 WL 5205775, at *8 ("Even if plaintiff and her husband suffered emotional distress from the possible loss of their home, plaintiff has not alleged that this injury was proximately caused by defendant's failure to comply with RESPA, *i.e.*, the form and timing of its response to plaintiff's letters."), *aff'd on other grounds*, 756 F.3d 178 (2d Cir. 2014).

The Court has found resolution of Plaintiff's first claim for damages — the fact that she now has a balloon payment due in March 2019 — to be the most challenging. After all, in the traditional RESPA Section 6 case, the failure of a servicer to provide information to a borrower or to correct errors in the borrower's account results in readily ascertainable damages, such as an unwarranted service charge or an inflated monthly mortgage payment. Here, however, the problem is the balloon payment itself, which was known and agreed to by Plaintiff in October 2013 and which itself is not due for more than two years. What is more, Plaintiff does not seek a free pass on that balloon

payment, but rather extension of the term loan — specific performance as opposed to actual damages.  Such relief, if granted, would appear to subvert the protocols in § 1024.41, if not RESPA entirely.  For these reasons, the Court declines to find that Plaintiff has alleged actual damages based on the existence of the balloon payment.

Finally, Plaintiff has failed to allege "a pattern or practice of noncompliance with the requirements" of § 2605 by Defendant.  *See* 12 U.S.C. § 2605(f)(1); *Gorbaty*, 2012 WL 1372260, at *5 ("Pattern or practice means a standard or routine way of operating." (citation and internal quotation marks omitted)).  Plaintiff's allegations of widespread misconduct by Defendant are wholly conclusory, and inadequate to support a claim under RESPA.  (*See, e.g.*, FAC ¶¶ 9 ("Additionally, Citi routinely flouts the laws that govern the mortgage servicing industry, namely the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 ('RESPA')."), 45 ("Citi's failure to abide by the Handbook in the Sutton's case was not an isolated occurrence."), 88 ("Upon information and belief, Citi's repeated refusal to comply with RESPA in response to Ms. Sutton's three QWRs is part of a pattern and practice of noncompliance with this Act."), 89 ("Upon information and belief, Citi's failure to maintain accurate information about investor restrictions fosters a pattern and practice of improper loan modification denials under 12 C.F.R. § 1024.41(d) (2016).")).

In sum, Plaintiff's failure to plead damages in accordance with RESPA's requirements is a second basis for dismissing her complaint.

**D.    The Court Declines to Exercise Jurisdiction Over Plaintiff's Claim Under N.Y. Gen. Bus. Law § 349**

Plaintiff separately claims that Defendant's conduct in responding to her 2014 inquiries amounts to a violation of Section 349 of New York's General Business Law, which proscribes "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," where such conduct is consumer-oriented.  That claim arises under New York State law, and the Court declines to exercise jurisdiction over it.

Under 28 U.S.C. § 1367(c)(3), a district court has discretion to "decline to exercise supplemental jurisdiction over" pendent state-law claims "if ... the district court has dismissed all claims over which it has original jurisdiction." *United Mine Workers of America* v. *Gibbs*, 383 U.S. 715 (1966), teaches that "[o]nce a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of [i] judicial economy, [ii] convenience, [iii] fairness, and [iv] comity,' in deciding whether to exercise jurisdiction."  *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)); *see Gibbs*, 383 U.S. at 726-27; *cf. Benjamin* v. *N.Y. City Dep't of Health*, 144 F. App'x 140, 142 (2d Cir. 2005) (summary order) ("In assessing whether § 1367(c)(3) discretion has been appropriately exercised, this Court looks mainly to whether a District Court reached unsettled issues of state law and to whether disposition was supported by *significant* considerations of judicial economy." (emphasis added)).  Those factors generally tilt toward dismissing state-law claims:  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to

41

be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see also Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that 'if [all] federal claims are dismissed *before trial* …, the state claims should be dismissed as well.'" (emphasis in original) (quoting *Castellano* v. *Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir. 1991)); *see generally Kroshnyi* v. *U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (collecting cases).

None of the *Gibbs* factors suggests that exercising pendent jurisdiction over Sutton's GBL claim is appropriate.  Judicial economy counsels in favor of dismissal, given the thin record in this case.  *See Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 392 (S.D.N.Y. 2013).  For similar reasons, combined with the fact that the parties in this case are all in New York, the Court perceives nothing notably inconvenient about requiring Sutton to litigate this claim in state court.  Finally, the comity interests here militate strongly in favor of dismissal.  "When the balance of [the *Gibbs*] factors indicates that a case properly belongs in state court, … the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Cohill*, 484 U.S. at 350.

**CONCLUSION**

For the reasons set forth above, Defendant's motion to dismiss is GRANTED as follows:  Plaintiff's claim under RESPA is dismissed with prejudice, while her claim under N.Y. Gen. Bus. Law § 349 is dismissed without prejudice.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:       January 12, 2017
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge